IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ADMOR HVAC PRODUCTS, INC., | ) | Civ. No. 19-00068 SOM-KJM |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT, CONCLUSIONS |
| | ) | OF LAW, AND ORDER DENYING |
| vs. | ) | PLAINTIFF'S MOTION FOR |
| | ) | PRELIMINARY INJUNCTION |
| ROBERT SONNY LESSARY and | ) | |
| HICOUSTIX LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**I.        INTRODUCTION.**

          Plaintiff Admor HVAC Products, Inc. ("Admor"), seeks a

preliminary injunction against its former employee Defendant

Robert Sonny Lessary and his company, Defendant Hicoustix LLC

("Hicoustix") (together, "Defendants").  ECF No. 10.  While

working as a salesperson for Admor, Lessary allegedly began

soliciting business for his own company, Hicoustix, which was in

competition with Admor.  Admor asserts nine causes of action

against Defendants: (1) violation of the Defend Trade Secrets

Act, 18 U.S.C. § 1836; (2) violation of the Racketeer Influenced

and Corrupt Organizations Act, 18 U.S.C. § 1962; (3) breach of

the duty of loyalty; (4) unfair competition under 15 U.S.C.

§ 1125(a); (5) unfair competition under § 480-2 of Hawaii

Revised Statutes; (6) tortious interference with prospective

business advantage; (7) tortious interference with business relations; (8) conversion; and (9) unjust enrichment. ECF No. 1.

> Admor's motion seeks an injunction:
>
> 1.   Preserving the status quo preventing Defendants from servicing any [and] all entities and individuals who were Admor customers and vendors [] as of April 1, 2018.
>
> 2.   Ordering the *in camera* production of the customer and vendor lists for Admor as of April 1, 2018 and Defendants as of December 1, 2018 to assist the Court in determining customers and vendors covered by the preliminary injunction.
>
> 3.   Prohibiting Defendants and anyone acting in concert with them from (i) possessing, using, and/or disclosing Admor's confidential/proprietary/trade secret information; (ii) accounting for and returning any and all confidential/proprietary/trade secret information to Admor; and (iii) otherwise unfairly competing with Admor.

ECF No. 10, PageID # 83.

The court held an evidentiary hearing on the motion on April 16, 2019. Prior to the hearing, the parties submitted Proposed Findings of Facts and Conclusions of Law ("Proposed FoF/CoL"). ECF Nos. 28, 29. In its Proposed FoF/CoL, Admor appeared to amend the relief sought in its motion, requesting an injunction:[1]

---

[1] Admor has not formally amended its motion for preliminary injunction. While making an objection at the hearing on April

2

> (1) that prevents Defendants from servicing
> any and all entities and individuals who
> were Admor customers and vendors as [of]
> *December 19, 201[8]*, the date of Lessary's
> termination of employment from Admor;
>
> (2) ordering the *in camera* production of the
> customer and vendor lists for Admor from
> *January 1, 2018 to December 19, 2018*, and
> Defendants as of *January 1, 2018*, to assist
> the Court in determining customers and
> vendors covered by the preliminary
> injunction;
>
> (3) prohibiting Defendants and anyone acting
> in concert with them from (i) possessing,
> using, and/or disclosing Admor's
> confidential/proprietary/trade secret
> information; (ii) *using Admor's name,*
> *symbols, and logos*; and (iii) otherwise
> unfairly competing with Admor; and
>
> (4) requiring Defendants to account for and
> return any and all
> confidential/proprietary/trade secret
> information to Admor.

ECF No. 29, PageID # 498 (emphases and spacing added).[2]

Admor does not show entitlement to either version of requested relief. The court denies Admor's motion for preliminary injunction and enters the following Findings of Fact, Conclusions of Law, and Order.

---

16, 2019, Admor's counsel stated only that "the relief asked for in the complaint has been revised in the written submissions on the motions." ECF No. 53, PageID # 805.

[2] On April 26, 2019, each party submitted an updated Proposed FoF/CoL that included transcript citations. ECF Nos. 54, 56. The court also allowed each party to submit a substantively amended Proposed FoF/CoL, which both parties did. ECF Nos. 59, 62.

II.      **FINDINGS OF FACT.**

Whenever, in the following discussion, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's statements shall have the effect they would have had if properly designated.  For ease of reference to particular findings and conclusions in later proceedings, the findings and conclusions are presented in numbered paragraphs.  The court does not recite all evidence presented during the evidentiary hearing on April 16, 2019, rather discussing evidence relevant to the court's ruling on Admor's motion for preliminary injunction.

The evidentiary hearing was conducted in accordance with this court's procedures for civil nonjury trials, which are reproduced, in substantially the same form followed here, in Appendix A to this court's decision in *Kuntz v. Sea Eagle Diving Adventures Corp.*, 199 F.R.D. 665 (D. Haw. 2001).  Direct testimony was presented by written declarations, with witnesses then subject to live cross-examination and redirect examination unless waived.

At the hearing, Admor presented testimony by Andrew Santos, Georgina Fuerte, and Rogen Gaspar.  Lessary presented testimony by himself, Anthony Ornellas, Michael Goodnight, Steven Allende, and Mario Geronimo.  The parties also submitted

"Stipulated Facts For Evidentiary Hearing."  ECF No. 30 ("Stip. Facts").

Based on the testimony presented at the hearing, the Stip. Facts, and the exhibits received into evidence, the court finds that the following facts have been established by a preponderance of the evidence.

### Admor's Business in Heating, Ventilation, and Air Conditioning ("HVAC").

1.    Admor is a Hawaii corporation that has been doing business in Hawaii since at least 1995.  Stip. Facts ¶ 1.  Admor is a wholesale distributor of HVAC products and accessories. Through its approximately 30 employees, it provides quality HVAC and insulation products, training, and support to contractors, architects, and engineers.  *Id.* ¶¶ 4-6.

2.    At all relevant times, Admor was involved in interstate commerce; its business regularly required the shipment of products across state lines.  Indeed, most of Admor's regular vendors were and are located outside of Hawaii. *Id.* ¶¶ 11, 50.

3.    Admor's revenue is driven by two groups: the contractors and subcontractors that make up most of its customers, and its vendors.  *Id.* ¶¶ 5, 9.

4.    Admor's salespeople meet with customers, discuss product lines required for customers' projects, and provide customers with quotes for those products.  The salespeople then

coordinate with Admor's vendors and execute sales orders for the customers' requested products. The products are shipped to a customer's job site, either from the vendor directly or from Admor's warehouse, where it keeps "stock" equipment and products. *Id.* ¶ 10.

5. To sell products, salespeople need extensive training so that they know how the products work and can explain to customers why certain products should be used on certain projects. Some vendors impose minimum training requirements on salespeople who sell their products. *Id.* ¶¶ 12-13.

**Lessary's Employment as an Admor Salesperson.**

6. Lessary is a resident of and domiciled in Hawaii. *Id.* ¶ 2. From 2005 until May 2009, he worked as a sales representative for G.W. Killebrew Co., Inc. ("Killebrew"), where he sold drywall products and acoustical paneling and ceilings to drywall contractors. ECF No. 49: Amended Declaration of Robert Sonny Lessary ("Lessary Decl.") ¶¶ 19, 21, 22. Lessary was employed by Admor as a salesperson from February 2010 until December 2018. Stip. Facts ¶ 7.

7. Several contractors who worked with Lessary at Killebrew followed him to Admor because of the relationships they had with him. *See* ECF No. 47: Amended Declaration of Anthony Ornellas ("Ornellas Decl.") ¶¶ 1-5; ECF No. 41: Declaration of Michael Goodnight ("Goodnight Decl.") ¶¶ 1-4; ECF

No. 48: Amended Declaration of Steven Allende ("Allende Decl.")
¶¶ 1-5; ECF No. 39: Declaration of Mario C. Geronimo ("Geronomio
Decl.") ¶¶ 1-5; Lessary Decl. ¶¶ 25-26.

8.    Lessary had no noncompete agreement,
nonsolicitation agreement, confidentiality contract, or
nonacceptance-of-business agreement with Admor.  Stip. Facts
¶¶ 17-19.

9.    While employed by Admor, Lessary received a
salary plus commissions and was reimbursed for his cellphone and
car-related expenses.  *Id.* ¶¶ 7, 8.  Admor also provided Lessary
with training in several product lines.  *Id.* ¶ 15; ECF No. 63:
Amended Declaration of Andrew Santos ("Santos Decl.") ¶ 39;
Exhibit Nos. P-51, P-53, P-53, P-54.

10.    For a period of time during his employment with
Admor, Lessary paid the salary of his two administrative
assistants, Raena and Moi.  Stip. Facts ¶ 21.  In addition,
Lessary relied on the support staff in several Admor
departments, including the accounting, warehouse, credit,
collections, order processing, and delivery departments.  Santos
Decl. ¶ 47.

11.    Lessary was Admor's primary "insulation guy,"
managing the customer and vendor sides of Admor's insulation
business.  He was trusted and given discretion in his job
responsibilities.  Stip. Facts ¶¶ 20, 35, 36.  He managed two

7

separate divisions at Admor: one in which he sold insulation and acoustical ceilings to drywall subcontractors, and another in which he sold insulation and sheet metal products and accessories to HVAC sheet metal and mechanical contractors. Lessary Decl. ¶ 28.

12. Rockfon, F-Sorb, and Service Partners became Admor vendors during Lessary's employment. Lessary was the principal and only contact at Admor for these vendors. Stip. Facts ¶¶ 32, 54. Rockfon, F-Sorb, and Service Partners generated $2,105.799.13 in gross sales for Admor in 2018. Santos Decl. ¶ 45. Lessary was the only Admor salesperson with the requisite training to sell Rockfon, and he knew the Rockfon product better than Admor's other salespeople. Stip. Facts ¶ 33. He was also the salesperson at Admor who knew the F-Sorb product best. *Id.* ¶ 34.

13. Lessary was also the salesperson at Admor closest to CD Builders, BEK, PMJ Builders, JDH, Protech Roofing, and Haas Insulation, all of which were contractors who were among Admor's customers. He was the primary contact at Admor for these contractors, though in some cases they also communicated with his administrative assistants and Admor's accounting department. ECF No. 31-1: Deposition of Andrew Santos taken March 12, 2019 ("Santos Depo.") at 64:22-65:4, 70:5-11, 75:24-76:4, 87:12-88:4, 89:20-90:2, 90:22-91:4.

**Admor's Protection of Customer and Vendor Information.**

14.   Admor's Employee Handbook refers to information about customers as protected information.  Stip. Facts ¶ 25.  On December 14, 2010, Lessary signed a "Receipt and Acknowledgment of Admor Group, Inc's Employee Handbook," which states, "I have received and read a copy of Admor Group, Inc's Employee Handbook.  I understand that the policies and benefits described in it are subject to change at the sole discretion of Admor Group Inc. at any time."  *Id.* ¶ 26; Exhibit No. P-1 at 1.

15.   Lessary received a copy of the 2015 version of the Admor Employee Handbook.  Stip. Facts ¶ 27.  That version includes a clause stating:

> NON-DISCLOSURE OF CONFIDENTIAL INFORMATION
>
> Employees are expected not to disclose to persons outside the Company any business information which is confidential or proprietary in nature.  Employees must maintain the confidentiality of the Company's business information, including but not limited to, business plans and strategies, business opportunities, company financial information (e.g., profit and loss statement, investment returns, accounts receivable), information regarding company purchases and sales, customer lists, customer contact information, and manufacturing methods and processes.  If you are in doubt as to whether particular internal business information is confidential or proprietary, you should consult with your supervisor before disclosing such information to third parties.

Exhibit No. P-2 at 40.

16. Admor has a customer and vendor database that
includes information such as names, phone numbers, email
addresses, payment history, purchase orders, and history of
purchase orders. Stip. Facts ¶ 22. It has taken Admor 25 years
to compile this information. Santos Decl. ¶ 53.

17. Not all of the information in the database is
kept confidential. Admor advertises vendor product lines on its
business line card. ECF No. 53, PageID # 807 (Santos testimony
during cross examination). However, the combination of all
information in the database is not publicly available. *Id.* at
# 847 (Santos testimony during re-direct).

18. In the database, Admor employees and salespeople
can create sales orders and access certain information about
customers, including order history and trends. The only people
at Admor who can change customer information are Georgina Fuerte
(Admor's Finance Manager, Secretary, Treasurer, and Director)
and Admor's accountants. Only Andrew Santos, Admor's President,
and the accountants can open or close a customer account. ECF
No. 35: Declaration of Georgina Fuerte ("Fuerte Decl.") ¶ 6.
The database is secured with a 4-digit security password. Stip.
Facts ¶ 23. Only current employees have access to the database.
Fuerte Decl. ¶ 7. The database includes 2,042 customers and 423
vendors. Stip. Facts ¶¶ 28, 30. That number includes past or

inactive customers and vendors, but Admor's active customers number 211, and its active vendors number 199.  Fuerte Decl. ¶ 4; ECF No. 53, PageID #s 803-04 (Santos testimony during cross examination).

20. Admor has security cameras in its warehouse and administrative business space.  Stip. Facts ¶ 24.

20. Lessary had access to the customer and vendor database while employed at Admor.  Fuerte Decl. ¶¶ 7, 10, 13. Admor's best estimate is that Lessary worked with approximately 100 customers and 23 vendors while employed by Admor.  Stip. Facts ¶¶ 29, 31.

21. Admor has no evidence that Lessary has lists of Admor's customers or vendors, or that he took such lists with him when he left Admor.  Santos Depo. at 20:19-21:13.  Nor does Admor have evidence that Lessary took pricing or costing information when he left Admor.  *Id.* at 43:6-44:25.

**Lessary's Formation and Running of Hicoustix While Employed by Admor.**

22. In or possibly before April 2018, while employed by Admor, Lessary began a business called Hicoustix that competed with Admor.  Stip. Facts ¶ 37.

23. Hicoustix is a Hawaii limited liability company that provides insulation and other product lines to consumers/contractors.  Such products are regularly shipped across state lines to Hawaii.  *Id.* ¶¶ 3, 39, 51.

24.  On August 2, 2018, Hicoustix was registered to do business in Hawaii as a member-managed company with Lessary as the sole member.  Hicoustix acts through Lessary.  *Id.* ¶¶ 38, 49.

25.  While employed by Admor, Lessary sent carbon copies of emails to his Admor email address when doing business from his Hicoustix email address, and vice versa.  *Id.* ¶ 52; *see, e.g.*, Exhibit Nos. P-3, P-4, P-6, P-7, P-10, P-11, P-22. In some of his emails, Lessary included pricing information for certain products.  Exhibit No. P-20 at 128-29; Exhibit No. P-30; *see also* ECF No. 53, PageID #s 949-50, 957 (Lessary testimony during cross examination).  When communicating with clients and vendors from his Admor email address, Lessary referred to a partnership between Admor and Hicoustix and/or to an arrangement in which Hicoustix received a commission for Admor sales.  *See* Exhibit P-9 at 77 (email correspondence with Bill Devin of Regupol America dated February 20, 2018, in which Lessary stated that "you'd just have to collect from ADMOR and pay out a commission check to HICOUSTIX"); Exhibit No. P-12 (email correspondence with Dennis Wakaluk of Rockfon dated May 2, 2018, in which Lessary stated that "I feel the ADMOR+HICOUSTIX partnership has helped to keep a project"); Exhibit No. P-23 (email correspondence with Kerrie Duncan of Soundseal dated September 18, 2018, in which Duncan asked Lessary for "full

information for Hicoustix for your commission"); Exhibit No. P-25 at 142 (email correspondence with Marc Sawyer of Soundseal dated September 28, 2018, in which Lessary wrote to "check[] if 10% in for HICOUSTIX or not").

26.  At least one Admor customer expressed confusion in response to Lessary's representation that Admor and Hicoustix were affiliated.  *See* Exhibit No. P-25 (Marc Sawyer of Soundseal stating, "I'm unaware of a 10% adder for HICOUSTIX??  Sorry, I'm not familiar with this arrangement.").

27.  Admor had not authorized Lessary to say that Admor and Hicoustix were affiliated.  Santos Decl. ¶ 65. Nevertheless, while on the job and acting as Admor's agent, Lessary sought projects and consumers for Hicoustix.  Stip. Facts ¶ 53; *see also* Exhibit P-9 at 74 (email correspondence with Bill Devin of Regupol dated February 21, 2018, in which Lessary stated, "HICOUSTIX is a new rep agency I started late last year to push specs for ROCKFON (an acoustical tile line distributed by ADMOR)"); Exhibit No. P-24 (email correspondence with Chris Hong of Chris Hong Design dated September 25, 2018, in which Lessary stated, "I've been putting together a pretty great collection of products under my rep agency company called HICOUSTIX"); Exhibit No. P-26 (email correspondence with David Sundberg of BEK Inc. dated November 9, 2018, in which Lessary

stated, "I represent Lumicor via HICOUSTIX and not ADMOR, so I'll reply officially from there").

28.  Rogene Gaspar and her husband run Nohoʻana Builders LCC ("Nohoʻana") and began doing business with Admor in June 2018 on a project using Rockfon products.  Lessary was Gaspar's contact at Admor.  ECF No. 36: Declaration of Rogene Gaspar ("Gaspar Decl.") ¶¶ 3-5.

29.  In text messages regarding Nohoʻana's payment for the Rockfon products, Lessary stated, "Aloha Rogene, [this is] Sonny with Admor and HICOUSTIX."  He further stated:

> Just a heads up, was only able to charge $5K today.  Will try again tomorrow for $5K and the balance of $1867.04 on Saturday. Charges will be under HICOUSTIX and not Admor as I'm transitioning to my new business and you're one of the first orders.

*Id.* ¶¶ 10-11; Exhibit No. P-46.

30.  Gaspar was confused and alarmed by these text messages because she thought that she was doing business with Admor, not Hicoustix.  She called her bank and learned that $5,000 had been debited from Nohoʻana's account.  Concerned about who was charging her, Gaspar closed her bank account. Gaspar Decl. ¶¶ 10-17.  Lessary later apologized for the confusion and sent Gaspar a check for $5,000.  *Id.* ¶¶ 22-27; Exhibit No. P-49; *see also* ECF No. 53, PageID # 922 (Lessary testimony on cross examination).

31.   In early December 2018, Lessary texted Gaspar and said, "Hey Rogene, checking in.  Can you please call in payment today for the order.  I advised my boss that I'm leaving the company and he's treating the order as theft because I let it go with no payment."  Gaspar Decl. ¶ 29; Exhibit No. P-49 at 319. Gaspar was concerned by the text message and went to discuss with Santos what had happened with Lessary.  Gaspar Decl. ¶¶ 30-32.  Gaspar continued to do business with Admor.  *Id.* ¶ 33.

32.   Lessary sold eight orders of products through Hicoustix while employed by Admor, which he admits he should not have done.  Lessary Decl. ¶ 16; *see also* Exhibit No. P-5.  He also admits that he made mistakes during his employment with Admor and says he is prepared to account for them.  Lessary Decl. ¶ 17.  He recognizes that he should not have represented in his emails and in his dealings with Gaspar that Admor and Hicoustix were affiliated.  ECF No. 53, PageID #s 922, 934, 953-54 (Lessary testimony during cross examination).

33.   Some contractors who worked with Lessary at Killebrew and Admor continue to work with Lessary at Hicoustix because of their long-standing relationships with him.  *See* Ornellas Decl. ¶¶ 1-6; Goodnight Decl. ¶¶ 1-5; Allende Decl. ¶¶ 1-6; Geronomio Decl. ¶¶ 1-6.

34.  Hicoustix currently sells acoustical ceilings and insulation products of vendors Rockfon, F-Sorb, and Service Partners.  Lessary Decl. ¶ 34.

**Admor's Termination of Lessary's Employment.**

35.  The first time Lessary told Santos that he wanted to start his own business was on December 13, 2018.  Stip. Facts ¶ 40.  Four days later, Admor's counsel sent Lessary a cease and desist letter titled "Unlawful Use and Misappropriation of Product Lines, Customer Lists, Proprietary Information and Trade Secrets of Admor HVAC."  *Id.* ¶ 41; Exhibit No. P-32.  Then, on December 19, 2018, Admor terminated Lessary's employment.  Stip. Facts ¶ 42.  Lessary was paid by Admor until December 26, 2018, but he says that his compensation was not calculated correctly. *Id.* ¶ 48.

36.  In an email dated January 17, 2019, Santos told Admor's vendors that Lessary was no longer employed by Admor. Exhibit No. P-57.  Admor did not notify contractors about Lessary's departure unless the contractors contacted Admor.  ECF No. 53, PageID # 823 (Santos testimony during cross examination).

**Harm to Admor from Lessary and Hicoustix.**

37.  Admor had been working on a project at Punahou School from around March or April 2018.  Santos Decl. ¶ 76.  The contractor customer was Creative Partition Systems, and the

16

vendors were Rockfon and Soundseal.  Lessary had worked on this project on behalf of Admor, but in late November 2018, though still employed by Admor, he began working on the Punahou School project through Hicoustix.  ECF No. 53, PageID #s 929-31 (Lessary testimony during cross examination).

38.  Rockfon and Admor had an exclusive vendor relationship that began in 2015.  On January 30, 2019, Rockfon terminated Admor's exclusive distributorship, stating that Rockfon had "made the business decision to no longer endorse exclusive distribution in Hawaii."  Santos Decl. ¶ 62; Exhibit Nos. P-50, P-56.  At this point, Admor is waiting for this litigation to end before it decides whether to hire or train someone new regarding the Rockfon line.  Stip. Facts ¶ 43.  Admor does not know whether Rockfon will change its business relationship with Admor in any way if Lessary is allowed to continue to do business with Rockfon.  *Id.* ¶ 44.

39.  Santos believes that Admor's reputation has been harmed by Hicoustix, but does not know how far the damage extends.  Santos Decl. ¶ 87.

40.  Lessary had purchased insulation products for Admor that Admor was left with in its warehouse and needed to sell after Lessary was fired.  *Id.* ¶ 90.  It turns out that Admor would have been left with this stock even if Lessary had

not done anything inappropriate.  ECF No. 53, PageID # 814
(Santos testimony during cross examination).

41.   Admor does not know whether F-Sorb will change
its business relationship with Admor in any way if Lessary is
allowed to continue to do business with F-Sorb.  Stip. Facts
¶ 45.  Admor is similarly uncertain whether Admor's current
relationships with contractors Creative Partition Systems or CD
Builders might change if no injunction issues.  *Id*. ¶¶ 46, 47.

### Potential Impact on Lessary of Prohibiting Defendants from Working With Admor Customers and Vendors.

42.   Lessary lives with his girlfriend and their three
minor children, all of whom rely on him for financial support.
Hicoustix is the sole source of income for his family.  Lessary
Decl. ¶¶ 38, 39.

43.   Hicoustix would be out of business if prohibited
from working with the vendors and customers covered in Admor's
requested injunction.  *Id*. ¶ 40.

44.   Anthony Ornellas is a Project Manager with CD
Builders and has known Lessary since 2005.  Ornellas is
currently working with Lessary on a project for First Hawaiian
Bank in Pearlridge that is expected to be completed in September
2019.  If Lessary were barred from working with CD Builders, CD
Builders says it would be financially harmed by the delays
caused to the project.  Ornellas Decl. ¶¶ 1, 3, 7.

45.  Michael Goodnight is President of Goodnight's
Corp. dba Construct Drywall Systems ("Construct Drywall") and
has known Lessary since 2005.  Goodnight is currently working
with Lessary on a project for the Adolescent Treatment and
Healing Center in Kauai that is expected to be completed in June
2019.  If Lessary were barred from working with Construct
Drywall, Construct Drywall says it would be financially harmed
by the delays caused to the project.  Goodnight Decl. ¶¶ 1, 3,
6.

46.  Steve Allende is a Project Estimator with Harner
Wall Systems ("Harner") and has known Lessary since 2005.
Allende is currently working with Lessary on a project for
Hawaii Vision in Hilo that is expected to be completed in the
summer of 2019.  If Lessary were barred from working with
Harner, Harner says it would be financially harmed by the delays
caused to the project.  Allende Decl. ¶ 1, 3, 7.

47.  Mario Geronimo is an Estimator/Project Manager
for Guy's Superior Interior, Inc. ("Guy's"), and has known
Lessary since 2004.  Geronimo is currently working with Lessary
on a Pali Momi Medical Center project in Aiea that is expected
to be completed in May 2019.  If Lessary were barred from
working with Guy's, Guy's says it would be financially harmed by
the delays caused to this project.  Geronimo Decl. ¶ 1, 3, 7.

**III.    CONCLUSIONS OF LAW.**

1.    The purpose of a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

2.    "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

3.    *Winter* makes clear that a preliminary injunction may not issue when a plaintiff who demonstrates a strong likelihood of prevailing on the merits shows only a possibility of irreparable harm. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22).

4.    The Supreme Court has cautioned that a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  Courts balance the

competing claims of injury and consider the effect on each party of granting or denying the injunction.

5.    A court should not grant a preliminary injunction "unless the movant, by *a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

6.    Admor establishes one of the four preliminary injunction factors.  Admor is likely to succeed on the merits of some of its claims, but has not established that the remaining three factors weigh in favor of granting the injunction it seeks.  Balancing the four factors, the court concludes that a preliminary injunction is not warranted in this case.

**Likelihood of Success on the Merits.**

7.    The Complaint asserts nine claims, but Admor's motion for preliminary injunction argues that it is likely to succeed on the merits of only six of them: (1) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"); (2) breach of the duty of loyalty; (3) unfair competition under 15 U.S.C. § 1125(a); (4) unfair competition under section 480-2 of Hawaii Revised Statutes; (5) tortious interference with prospective business advantage; and (6) tortious interference with business relations.  The court addresses the claims in order and concludes that, on the present record, Admor is likely to succeed on its claims of breach of the duty of loyalty, unfair

competition under 15 U.S.C. § 1125(a), and tortious interference with prospective business advantage.

8.   **First,** Admor fails to show on the present record that Lessary violated the DTSA because Admor has not established that Lessary misappropriated any Admor trade secrets.

9.   The theft of trade secrets is prohibited by 18 U.S.C. § 1832, which states:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
>
> > (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information[.]

The DTSA allows for private civil actions to enforce § 1832: "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

10.   Section 1839(3) defines a "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored,

22

compiled, or memorialized physically,
electronically, graphically,
photographically, or in writing if—

> (A) the owner thereof has taken
> reasonable measures to keep such
> information secret; and

> (B) the information derives independent
> economic value, actual or potential,
> from not being generally known to, and
> not being readily ascertainable through
> proper means by, another person who can
> obtain economic value from the
> disclosure or use of the information[.]

"[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (citing *Univ. Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989)).

11. Section 1839(5) defines "misappropriation" as:

(A) acquisition of a trade secret of another
by a person who knows or has reason to know
that the trade secret was acquired by
improper means; or

(B) disclosure or use of a trade secret of
another without express or implied consent
by a person who—

(i) used improper means to acquire
knowledge of the trade secret;

(ii) at the time of disclosure or use,
knew or had reason to know that the
knowledge of the trade secret was—

(I) derived from or through a
person who had used improper means
to acquire the trade secret;

(II) acquired under circumstances
giving rise to a duty to maintain
the secrecy of the trade secret or
limit the use of the trade secret;
or

(III) derived from or through a
person who owed a duty to the
person seeking relief to maintain
the secrecy of the trade secret or
limit the use of the trade
secret[.]

12.   Admor asserts that its trade secrets are "Admor's
compilations of information (i.e. vendor and customer lists,
which encompass methods of operations including cost and pricing
information and marketing strategies and processes)."  ECF No.
56, PageID # 1048; ECF No. 62, PageID # 1181.  At the hearing,
Admor presented evidence regarding the computer database that
contains its vendor and customer lists.

13.   Admor's customer and vendor database--which
includes contact information, payment history, and purchase
order history--may constitute trade secret information.  Contact
information would generally not receive trade secret protection
because such information could be easily obtained and would not

24

have independent economic value.  However, "[c]ustomer information such as sales history and customer needs and preferences constitute trade secrets."  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072 (N.D. Cal 2016) (citing *MAI Sys. Corp.*, 991 F.2d at 521).  Admor has established that its database contains this type of information.  Even though not all of the information in the database is kept confidential, the collective information in the database has taken years to compile and is not publicly available.  *See Pryo Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012) ("[W]here the party compiling [] customer lists, while using public information as a source, . . . expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection" (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1062-63, 1066 (D. Kan. 2001)).

14.  Moreover, Admor has taken reasonable measures to protect its customer and vendor database.  Admor requires all employees to read and sign the "NON-DISCLOSURE OF CONFIDENTIAL INFORMATION" clause of the Admor Employee Handbook, and Admor requires a password to access its database.  Only current Admor employees have access to the database, and only certain

employees can change customer information in the database.
Admor also has security cameras around its premises.

15.   But even if Admor's customer and vendor database
constitutes trade secret information, Admor has not established
that Lessary misappropriated the database.  Nothing in the
record suggests that Lessary acquired or disclosed anything from
the database.  Admor admits that it does not have any evidence
that Lessary took any customers lists, vendors lists, or pricing
and costing information with him when he left Admor.

16.   Admor argues that "Hicoustix targeted profitable
customers and vendors whose relationships were established by
Admor" and that "all or a significant portion of every single
one of the Hicoustix vendors and customers were directed to
Hi[]coustix by Sonny using his status as an Admor employee."
ECF No. 10, PageID # 74.  While Lessary was actively soliciting
business for Hicoustix as an Admor employee, Admor did not
establish by a preponderance of the evidence that Hicoustix
obtained those customers and vendors by using Admor's database.

17.   Notably, Lessary never signed any noncompete
agreement, nonsolicitation agreement, confidentiality contract,
or nonacceptance-of-business agreement with Admor.  Even if some
or all of Hicoustix's customers and vendors previously worked
with Admor, that does not necessarily mean that Lessary
misappropriated Admor's trade secret information.

18. Defendants demonstrated that Lessary was Admor's primary contact for many contractors and vendors, and that he had relationships with some of them that predated Admor. Rockfon, F-Sorb, and Service Partners became Admor vendors while Lessary was with Admor, and he was the salesperson who knew those vendors the best. He was also the most knowledgeable salesperson at Admor with respect to several contractors. Other contractors testified that they moved with Lessary from Killebrew to Admor, and then from Admor to Hicoustix, because of their long-standing working relationships with him. The evidence suggests that Lessary attracted customers and vendors to Hicoustix by using his familiarity with them and his expertise from years of working as a salesperson, not by using Admor trade secret information.

19. The court notes that, in several emails to Admor customers in which he copied his Hicoustix email address, Lessary included pricing information for certain products. Pricing information may be considered trade secret information in some circumstances. *See Hilderman v. Enea TekSci, Inc*., 551 F. Supp. 2d 1183, 1200 (S.D. Cal. 2008) (holding that there was an issue of fact with respect to whether pricing information was trade secret information).

20. However, Admor did not meet its burden of showing that the specific pricing information included in these emails

was Admor's trade secret information. *See MAI Sys. Corp.*, 991 F.2d at 522. Admor elicited testimony from Lessary that the pricing information from one of the emails was not publicly available, but that fact alone is insufficient to prove entitlement to trade secret protection.[3] Admor failed, for example, to demonstrate that it takes reasonable measures to protect that pricing information.

21. The focus of Admor's arguments in support of its DTSA claim was undoubtedly its database and the compilation of information therein. *See, e.g.*, ECF No. 62, PageID #s 1181-86, 1197-1205. Admor mentioned pricing information in its discussion of the database, but Admor "failed to sufficiently identify the actual substance of putative trade secrets beyond generalized categories of . . . pricing information." *See Mitigation Techs., Inc. v.* Pennartz, No. ED CV 14-01954-AB (SPx), 2015 WL 12656936, at *6 (C.D. Cal. Mar. 13, 2015) (holding that plaintiffs did not offer evidence that its customer list, quotations, pricing, and materials information constituted trade secrets). Admor did not connect the pricing information contained in the emails to its database or otherwise identify with "sufficient particularly" the boundaries of

---

[3] During the hearing, Admor had no objection to publishing the exhibits to the gallery, even when the court reminded the parties of the allegations of trade secret information and of the option of not publishing sensitive information. ECF No. 53, PageID #s 780-82.

Admor's trade secrets with respect to pricing information.  *See Imax Corp.*, 152 F.3d at 1164-65.

22.  **Second,** Admor is likely prevail on its claim that Lessary breached his duty of loyalty to Admor.  Defendants concede this point.  ECF No. 15, PageID # 116.

23.  "It is clear under Hawaii law that employees owe their employer a duty of loyalty." *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1085 (9th Cir. 2003) (citing *Stout v. Laws*, 37 Haw. 382, 392 (1946)).  An employee owes a duty "not to compete with the principal concerning the subject matter of his agency." *Id.* (quoting Restatement (Second) of Agency § 393). "Although an employee 'is entitled to make arrangements to compete' with his employer prior to terminating the employment relationship, the employee is not 'entitled to solicit customers for such rival business before the end of his employment.'" *Id.* (quoting Restatement (Second) of Agency § 393 cmt. e).

24.  Admor presented substantial evidence that, while employed by Admor, Lessary began running Hicoustix and communicated several times with Admor clients and vendors on behalf of Hicoustix in order to build business for Hicoustix. Lessary admits that, while employed by Admor, he made sales and sought commissions for Hicoustix.  He was not merely "mak[ing] arrangements," but was "solicit[ing] customers for [a] rival business before the end of his employment." *Eckard Brandes*, 338

F.3d at 1085. Admor is likely to prevail on this claim. *See id.* at 1086 (stating that a "classic case" of a breach of the duty of loyalty involves employees forming their own partnership and soliciting customers).

25. However, when Lessary stopped working as Admor's employee, he no longer owed them a duty of loyalty. *See* Restatement (Second) of Agency § 393 cmt. e; *see also Phillips v. Mabus*, 894 F. Supp. 2d 71, 93 (D.D.C. 2012) ("[A]n employee's fiduciary duty ends upon termination of the employment relationship."). At that point, because there was no noncompete or nonsolicitation agreement in place, he was free to compete with Admor and to solicit their customers.

26. **Third,** Admor is likely to prevail on its claim that Lessary's conduct constituted unfair competition under 15 U.S.C § 1125(a).

27. Section 1125(a), also referred to as § 43(a) of the Lanham Act, provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or

> approval of his or her goods, services,
> or commercial activities by another
> person, or
>
> (B) in commercial advertising or
> promotion, misrepresents the nature,
> characteristics, qualities, or
> geographic origin of his or her or
> another person's goods, services, or
> commercial activities,
>
> shall be liable in a civil action by any
> person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C § 1125(a)(1). "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (quoting 15 U.S.C. § 1127). The Act "applies to both registered and unregistered trademarks[.]" *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999). However, § 43(a) "does not have boundless application as a remedy for unfair trade practices." *Dastar*, 539 U.S. at 29 (quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2nd Cir. 1974)). "Because of its inherently limited wording, § 43(a) can never be a federal codification of the overall law of unfair competition, but can apply only to certain unfair trade practices prohibited by its text." *Id.* (internal modifications, quotations, and citation omitted).

28.  Lessary comingled his Admor and Hicoustix email addresses by copying his Hicoustix email address on Admor-related email correspondence and by using a Hicoustix signature block when sending messages from his Admor email address.  In his emails to Admor customers, Lessary also referred to a partnership between Admor and Hicoustix and to an arrangement in which Hicoustix received a commission for Admor sales.  No such partnership or arrangement existed.  At least one Admor customer expressed confusion in response to Lessary's email representations.

29.  Another Admor customer, Rogene Gaspar, testified that she was confused by Lessary's suggestion that there was a business relationship between Admor and Hicoustix.  Lessary used Admor's name in his text messages to Gaspar while seeking payment for Hicoustix.  Gaspar was alarmed to find out that she had paid Hicoustix $5,000 when she understood that her project was being handled by Admor, and she cancelled her bank account to prevent further payments to Hicoustix.

30.  By using his Admor email address and Admor's name to conduct business for Hicoustix, Lessary was "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of Hicoustix with Admor.  These actions may have damaged Admor's credibility and reputation and likely violated § 43(a).

31. **Fourth,** Admor fails to show on the present record that it is likely to win on its unfair competition claim under chapter 480 of Hawaii Revised Statutes. There is insufficient evidence going to the amount of Admor's damages resulting from Lessary's conduct.

32. "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." HRS § 480-2. Chapter 480 of Hawaii Revised Statutes is a remedial statute that is construed liberally. *See Cieri v. Leticia Query Realty, Inc.*, 80 Haw. 54, 68, 905 P.2d 29, 43 (1995).

33. An unfair competition claim requires proof of: "(1) violation of HRS chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages." *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 435, 228 P.3d 303, 315 (2010) (citing *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 113 Haw. 77, 114, 148 P.3d 1179, 1216 (2006)).

34. Admor argues that Defendants' conduct was deceptive. ECF No. 10, PageID # 77. A deceptive act or practice that violates chapter 480 is "(1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material." *Courbat v.*

*Dahana Ranch, Inc.*, 111 Haw. 254, 262, 141 P.3d 427, 435 (2006). Lessary actively pursued business for Hicoustix while employed by Admor. Lessary may have misled Admor customers by using both his Admor and Hicoustix email addresses when communicating with them, and by referring to an arrangement between Admor and Hicoustix that did not exist. This conduct might be a deceptive act or practice under chapter 480 of Hawaii Revised Statutes. Admor has shown that it likely satisfies the first element of its unfair competition claim.

35. With respect to the second element, Admor presented evidence that its business was injured by Lessary's conduct. While employed by Admor, Lessary sold eight orders of products through Hicoustix and sought commissions for Hicoustix. Admor lost a project at Punahou School to Hicoustix, which began working on the project while Lessary was still employed by Admor. There is also evidence that Admor's reputation was harmed when Lessary confused clients by soliciting business for Hicoustix as an Admor employee.

36. However, Admor has failed to put forth any evidence regarding the third element. There is nothing in the record regarding the amount of damage stemming from any of the injuries allegedly caused by Defendants. Without evidence going to the third element, Admor cannot show that it will likely prevail on its unfair competition claim.

37.  **Fifth,** Admor is likely to prevail on its claim of tortious interference with prospective business advantage.

38.  A claim for tortious interference with prospective business advantage consists of five elements: "(1) the existence of a valid business relationship or a prospective advantage or expectancy that is reasonably probable of maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) purposeful intent to interfere with the relationship, advantage or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages." *Wadsworth v. KSL Grand Wailea Resort, Inc.*, 818 F. Supp. 2d 1240, 1252 (D. Haw. 2010) (citing *Meridian Mortg. Inc. v. First Hawaiian Bank*, 109 Haw. 35, 47-48, 122 P.3d 1133, 1145-46 (App. 2005)).

39.  In its motion for preliminary injunction, Admor argues that "[t]he evidence [will] show that Admor had (a) exclusive relations with certain vendors including, but not limited [to] Vendor A and Vendor B, (b) loyal relationships with its customers, (c) was the primary services provider on Project X; all of which provided Admor with economic relationships, and (d) Defendants interfered with those existing relationships." ECF No. 10, PageID # 80.  Admor has not clearly identified who

35

Vendors A and B are or what Project X is. Based on the evidence presented, it appears that either Vendor A or B refers to Rockfon and that Project X refers to the project at Punahou School.

40. Admor likely satisfies the five elements of a tortious interference claim based on the loss of the Punahou School project. Admor began servicing the project in March or April 2018, and Lessary worked on the project as a salesperson on behalf of Admor. At some point, Lessary must have solicited the Punahou School project for Hicoustix because, by November 2018, Hicoustix was working on the project.

41. Admor has a much weaker claim with respect to the loss of the Rockfon exclusive distributorship. Rockfon and Admor had an exclusive vendor relationship beginning in 2015, and on January 30, 2019, Rockfon terminated that relationship. The letter from Rockfon terminating the relationship was submitted as evidence, but nothing in the letter suggests that Lessary or Hicoustix had any role in Rockfon's decision. Admor has so far not demonstrated that Defendants legally caused Admor to lose its exclusive distributorship.

42. **Sixth and finally,** Admor fails to show on the present record that it is likely to win on its claim of tortious interference with business relations.

43.    Using the same arguments described above, Admor
attempts to bring a claim based on tortious interference with
"business relations" that is separate from its "prospective
business advantage" tortious interference claim.  However,
Hawaii law does not recognize two distinct tortious interference
claims.  Indeed, Admor's only support for claiming that it may
proceed with two tortious interference claims is a Ninth Circuit
case applying California law.  ECF No. 10, PageID #s 79-80
(citing *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913
F.2d 676, 689 (9th Cir. 1990)).  Admor does not show a
likelihood of success on a separate claim of tortious
interference with business relations.

**Irreparable Harm.**

44.    Admor has not established that it will suffer
irreparable harm in the absence of the injunction it seeks.

45.    "Under *Winter*, plaintiffs must establish that
irreparable harm is likely, not just possible, in order to
obtain a preliminary injunction."  *All. For The Wild Rockies v.
Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  A plaintiff has
the burden of demonstrating that the irreparable harm is
"immediate" and that a "sufficient causal connection" exists
between the harm and the allegedly wrongful acts.  *L.A. Mem'l
Coliseum Comm. v. Nat'l Football League*, 634 F.2d 1197, 1201

(1980); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).

46.   Admor has not demonstrated that it will likely suffer irreparable harm if this court declines to issue a preliminary injunction.  Admor asserts that "[t]he substantial evidence of irreparable harm is a compelling reason to preserve the status quo as of April 1, 2018," but it fails to clearly identify what that evidence is.  *See* ECF No. 10, PageID # 81. The evidence presented at the hearing suggests that, while Lessary was employed by Admor, Admor was harmed by Lessary's actions seeking sales and commissions for Hicoustix instead of for Admor, the loss of the Punahou School project to Hicoustix, and the possible reputational harm caused by customer confusion. The first two appear to be compensable with monetary damages. "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."  *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also L.A. Mem'l Coliseum*, 634 F.2d at 1202 ("It is well established [that] monetary injury [such as lost revenue] is not normally considered irreparable.").

47.   Admor's claim of reputational harm may go beyond money damages.  Admor is correct that "the loss of clients and market share is not economic loss that can be fully compensated

by a damage award." ECF No. 10, PageID # 80 (quoting *UARCO Inc.* *v. Lam*, 18 F. Supp. 2d 1116, 1125 (D. Haw. 1998)). Similarly, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 842 (9th Cir. 2001).

48. However, Admor has not established that it will lose customers and goodwill absent an injunction. Admor admits that it does not know whether there will be any change to Admor's relationships with contractors Creative Partition Systems or CD Builders if no injunction issues. Gaspar testified that she would continue to do business with Admor. Rockfon ended its exclusive vendor distributorship with Admor, but it is unclear whether there was a causal connection between Rockfon's decision and Defendants' conduct or whether Rockfron has stopped doing business with Admor. Admor does not know whether Rockfon and F-Sorb would change their business relationships with Admor in any way if Lessary is allowed to continue to do business with them. Any future loss of customers and goodwill is speculative, and "[s]peculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

49.  Nor does the evidence suggest that Admor has taken steps to mitigate the threat of irreparable harm it says it faces from Defendants.  When Lessary left Admor, Admor notified vendors of Lessary's departure, but did not notify contractors.  Admor further admits that it is waiting for the litigation to end before it decides whether to hire or train someone regarding the Rockfon line, even though Rockfon requires training to sell its products.  On the present record, the court sees no immediate risk that, absent an injunction, Admor will in the future lose clients, market share, or goodwill that it now has.

**Balance of Equities.**

50.  The balance of equities tips in Defendants' favor.

51.  "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).  The balance of hardships generally tips in a plaintiff's favor when an injunction would "do no more than require [a] [d]efendant to comply with federal and state . . . laws." *Schein*, 191 F. Supp. 3d at 1077 (quoting *Dish Network L.L.C. v. Ramirez*, No. 15-cv-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016)).

52.  Admor seeks an injunction that would, among other
things, prevent Defendants from "servicing any [and] all
entities and individuals who were Admor customers and vendors"
as of April 1, 2018, or, according to its Proposed FoF/COL,
December 19, 2018.  ECF No. 1, PageID # 83; ECF No. 29, PageID
# 498.  Lessary testified that an injunction prohibiting him
from working with Admor's former customers and vendors would put
Hicoustix out of business.  *See Cy Wakeman, Inc. v. Nicole Price
Consulting, LLC*, 284 F. Supp. 3d 985, 995 (D. Neb. 2018)
(concluding that the balance of harms tips in favor of defendant
when granting the injunction would close defendant's business).
As Lessary is the sole source of income for his family, he would
suffer great financial hardship if unable to run Hicoustix.

53.  Admor argues that "[p]reserving the status quo of
April 1, 2018 by precluding Defendants from servicing customers
or vendors that were taken based on the misappropriation of
Trade Secrets, breach of the duty of loyalty, unfair
competition, and tortious interference will put Defendants in
the position they would be in had they used honest means to
enter the Hawaii market."  ECF No. 10, PageID # 82.  However,
Admor has not established which, if any, customers and vendors
were misappropriated by Defendants.  Importantly, Lessary never
signed any noncompete agreement, nonsolicitation agreement,
confidentiality contract, or nonacceptance-of-business agreement

with Admor. He is therefore not currently restricted from soliciting and servicing clients and vendors who also work with Admor.

54. Moreover, Admor admits that Lessary worked with only 100 of Admor's 2,042 customers and 23 of Admor's 423 vendors. In its Proposed FoF/CoL and at the hearing, Admor narrowed its requested injunction to cover only 211 active customers and 199 active vendors. Even so, Admor is hoping to prevent Defendants from working with customers and vendors who never worked with Lessary while he was with Admor. The requested injunction would not preserve the status quo; it would make Defendants significantly worse off and give Admor a competitive advantage going forward.

55. Admor also argues that "Defendants' unlawful conduct threatens to destroy years of dedicated work by Admor." ECF No. 10, PageID # 82. But Admor has not demonstrated that such an ongoing threat exists or that Admor is currently at risk of losing business based on any unlawful conduct by Defendants.

56. Admor cites to *WHIC LLC v. NextGen Laboratories, Inc.*, 341 F. Supp. 3d 1147 (D. Haw. 2018), arguing that it stands for the proposition that an injunction is warranted "where all of the former employee's new business consisted of misappropriated clients." ECF No. 20, PageID # 244. In that case, the court concluded after an evidentiary hearing that

Heidi Maki, a defendant and the plaintiff's former employee, had actively recruited clients away from the plaintiff by using the plaintiff's trade secret information and by lying about several aspects of the plaintiff's business. *See* 341 F. Supp. at 1164-66.

57. Admor's reliance on *WHIC* is misplaced. Unlike the plaintiff in *WHIC*, Admor has not presented evidence establishing that, but for his wrongful conduct, Lessary would not be working with Admor's former clients or that Lessary's business is made up solely of misappropriated clients. Lessary worked with several of Hicoustix's current clients before working for Admor, and those clients' decisions to continue working with him may be based on their long-standing business relationships, not on any lies Lessary told them about Admor.

58. The potential hardship to Defendants of the requested injunction outweighs the threatened injury to Admor.

**Public Interest.**

59. Admor has not demonstrated that an injunction would be in the public interest.

60. The Ninth Circuit has explained:

> The plaintiffs bear the initial burden of showing that the injunction is in the public interest. *See Winter*, 129 S.Ct. at 378. However, the district court need not consider public consequences that are "highly speculative." In other words, the court should weigh the public interest in light of the likely consequences of the

43

> injunction.  Such consequences must not be
> too remote, insubstantial, or speculative
> and must be supported by evidence.

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)

(some quotations and citations omitted).  "The public interest

inquiry primarily addresses [the] impact on non-parties rather

than parties."  *Sammartano v. First Judicial Dist. Court*, 303

F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by

Winter*, 555 U.S. at 22.

61.  Admor argues that the public interest weighs in

favor of granting injunctive relief because "[t]rade secrets are

broadly defined by Congress and the Hawaii State Legislature,"

and "the Hawaii State Legislature has placed great emphasis on

preventing unfair competition."  ECF No. 10, PageID # 82.  These

alleged public consequences are "too remote, insubstantial, or

speculative" and are not "supported by evidence."  *Stormans*, 586

F.3d at 1139.  State and federal laws protecting trade secrets

and preventing unfair competition do not provide that the public

interest is served in every case alleging trade secret

violations or unfair competition.  Without more, Admor fails to

meet its burden of showing that the injunction is in the public

interest.

62.  Moreover, Defendants submitted several

declarations from customers who are working with Defendants on

ongoing projects.  Those customers say they would be financially

44

harmed if Defendants were barred from working with them because of the resulting delays to those projects, presumably as the third parties sought replacements for Hicoustix. The third parties who would be harmed by Admor's requested injunction weigh against a finding that the injunction is in the public interest.

**IV.     ORDER.**

Admor does not show that the extraordinary remedy of a preliminary injunction is warranted here. Admor's motion for preliminary injunction is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 18, 2019.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Admor HVAC Products, Inc. v. Robert Sonny Lessary, et al., Civ. No. 19-00068 SOM-KJM; FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION.